# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 15, 2023

Lyle W. Cayce
Clerk

———————

No. 22-50536

———————

Vote.Org,

*Plaintiff—Appellee*,

*versus*

Jacquelyn Callanen; Et al.,

*Defendants*,

*versus*

Ken Paxton, *In His Official Capacity as the Attorney General of Texas*; Lupe C. Torres, *In His Official Capacity as the Medina County Elections Administrator*; Terrie Pendley, *In Her Official Capacity as the Real County Tax Assessor-Collector*,

*Intervenor Defendants—Appellants*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-649

———————————————————

Before Barksdale, Southwick, and Higginson, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

A non-profit organization whose stated mission is to simplify voting brought suit against four county election officials in Texas. It alleged that a

No. 22-50536

Texas law requiring an original signature on a voter registration form violates the Civil Rights Act of 1964 and the First and Fourteenth Amendments' ban on imposing undue burdens on the right to vote. The Texas requirement frustrated use of the organization's smartphone app that allows for digitized signatures only. The Attorney General of Texas intervened and has been the party actively defending the law. The district court granted summary judgment in favor of the organization. We REVERSE and RENDER.

FACTUAL AND PROCEDURAL BACKGROUND

As is standard in the United States, an individual in Texas must register to vote before casting a ballot. To register, applicants "must submit an application to the registrar of the county in which the person resides." TEX. ELEC. CODE § 13.002(a). That "application must be in writing and signed by the applicant." § 13.002(b).

The application form is available both online and at government offices designated as "voter registration agencies," such as the Department of Public Safety and public libraries. §§ 20.001, 20.031. The Secretary of State and county registrars will also, upon request, mail applicants a postage-paid application form.

Texans have several ways to submit their applications. They can submit the application by personal delivery or United States mail directly to the county registrar. § 13.002(a). Voter registration agencies are also required to accept registration applications and deliver them to the county registrar. §§ 20.001, 20.035. Moreover, counties may appoint "volunteer deputy registrars" to distribute and accept applications on the county registrar's behalf. §§ 13.031, 13.038, 13.041. If an applicant submits an incomplete voter registration application, then the county registrar will notify the applicant and allow ten days to cure the deficiency. § 13.073.

Once an application form is received, the county registrar reviews it to ensure the necessary information, including a signature, is present. Upon confirming completeness of the form, registrars generally scan or enter the applicants' information in their computer system and save images of the signatures. Some counties then destroy the original applications. The applicants' information is electronically transmitted to the office of the Texas Secretary of State. The Secretary's office processes these applications if the essential information — such as a person's last name, date of birth, and social security number — is accurate.

In 2013, the Texas Legislature enacted Senate Bill 910, which allows individuals to transmit voter registration forms by facsimile, *i.e.*, a fax, if they then, within four days, deliver or mail a hardcopy of the application. §§ 13.002(a), 13.143(d-2). When applicants use this method, the effective date of registration is the day of the fax transmissions. § 13.143(d)(2).

The plaintiff, Vote.org, developed a smartphone application, or "app," that it argues allows Texans to satisfy all enforceable voter registration requirements online. In an earlier decision that granted a stay of the district court's injunction, this court described Vote.org as "a non-profit, non-membership organization that seeks to simplify and streamline political engagement by, for example, facilitating voter registration." *Vote.Org v. Callanen*, 39 F.4th 297, 301 (5th Cir. 2022). The organization works to support low-propensity voters, including racial and ethnic minorities and younger voters. The app prompts applicants for information and auto-fills it onto the voter registration form. To sign the form, applicants sign a piece of paper, take a photo of it, and upload the photo to the app. The app then affixes the signature onto the registration form and transmits the form to two third-party vendors: one that sends the form to the county registrar via fax and another that mails a paper copy of the application to the county registrar. *Id.* at 301.

No. 22-50536

In 2018, Vote.org began its registration efforts in Bexar, Cameron, Dallas, and Travis counties. *Id.* at 301. After some technical problems were resolved, over 2,000 Texans registered to vote using the app. In October 2018, the Texas Secretary of State issued a press release stating that "[a]ny web site that misleadingly claims to assist voters in registering to vote online by simply submitting a digital signature is not authorized to do so." After this statement, Vote.org shut off its app.

In mid-June 2021, the Texas Governor signed House Bill 3107, which clarified that applicants using the fax option must subsequently mail a paper application to the registrar that "contain[s] the voter's original signature." § 13.143(d-2). The parties refer to this as the "Wet Signature Rule," and we also will at times even though "original signature" seems clear enough. The Secretary's Rule 30(b)(6) designee explained in his deposition that the impetus behind the 2021 statute was "Vote.org's misreading of [the signature requirement] in 2018."

In July 2021, Vote.org sued voter registrars in four counties under 42 U.S.C. § 1983, seeking to enjoin Section 13.143(d-2)'s signature requirement. Vote.org alleged a violation of federal rights established in the Civil Rights Act of 1964, specifically that the right to vote shall not be denied due to immaterial errors or omissions on any record relating to registration or other voting requirements. 52 U.S.C. § 10101(a)(2).[1] Also alleged was that

---

[1] The defendants' briefing usually cites this key statute as "Section 1971," a former section of Title 42; the plaintiff cites to 52 U.S.C. § 10101. The conflicting cites illustrate that the location of statutes in the U.S. Code can change. "The responsibility for creating and maintaining the Code has always been lodged in various locations within the House of Representatives." Will Tress, *Lost Laws: What We Can't Find in the United States Code*, 40 GOLDEN GATE U. L. REV. 129, 143 (2010). The first official compilations were in 1873 and 1878, enacted by Congress and called the REVISED STATUTES. *Id.* at 134–35. Controversies over those compilations may have delayed any new ones until the first United States Code was published in 1926; beginning in 1934, there has been a new official

No. 22-50536

requiring an original signature unduly burdens the right to vote in violation of the First and Fourteenth Amendments. In September 2021, the district court granted motions to intervene as defendants filed by the Texas Attorney General and the voter registrars of two additional counties.

After discovery, the defendants and Vote.org filed competing motions for summary judgment. The district court granted Vote.org's motion. *Vote.org v. Callanen*, 609 F. Supp. 3d 515, 540 (W.D. Tex. 2022). The court concluded that requiring an original signature violates Section 10101 of Title 52 because such a signature is not "material" to an individual's qualifications to vote. *Id.* at 527–32. The court also determined that the requirement unduly burdens the right to vote in violation of the First and Fourteenth Amendments. *Id.* at 532–39. The court permanently enjoined the defendants from enforcing the Wet Signature Rule. *Id.* at 540. The original defendants did not appeal. The only briefing from an appellant is by the Attorney General as intervenor. Consequently, we will refer to the appellants as Texas or the State.

_____

edition of the Code every six years. *Id*. at 135–37 & 137 n.42 (citing 1 U.S.C. § 202(c)). In the 1934, 1940, and 1946 Codes, the then-sole section of this key statute was in the Code title for "Aliens and Citizenship" or "Aliens and Nationality" as 8 U.S.C. § 31 (1934, 1940, 1946). What is now 42 U.S.C. § 1983 was also in that title: 8 U.S.C. § 43 (1934, 1940, 1946). In the 1952 Code, the sections were recodified in the title for "Public Health and Welfare" as 42 U.S.C. § 1971 and § 1983 (1952). *See* 1952 Code at 713–14 (explaining omissions, repeals, and transfers of Title 8 sections to other titles).

In 1974, the Office of the Law Revision Counsel of the House of Representatives was created and became responsible for codification. Pub. L. No. 93-554, Title I, ch. III, § 101, Dec. 27, 1974, 88 Stat. 1777, codified as 2 U.S.C. § 285–285g. "In 2014, provisions relating to voting and elections were transferred in the United States Code from titles 2 and 42 into a new Title 52, Voting and Elections." Office of the Law Revision Counsel, United States Code, Editorial Reclassification, Title 52, United States Code, found at https://uscode.house.gov/editorialreclassification/t52/index.html. Section 1971 became 52 U.S.C. § 10101. *Id*. (link to chart of transferred provisions). Section 1983, a broadly-applicable civil rights statute, was not transferred. Of course, we cite the current Code.

A motions panel of this court granted a stay of the injunction pending resolution of the appeal. *Vote.org*, 39 F.4th at 309. That panel held that all the factors for a stay, including likelihood of success on the merits by the appellants, had been satisfied. *Id.* at 308–09. This motions panel decision does not bind us as a merits panel. *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017). We have, though, examined that opinion closely and respectfully.

## DISCUSSION

We review the grant of summary judgment *de novo*. *Nationwide Mut. Ins. Co. v. Baptist*, 762 F.3d 447, 449 (5th Cir. 2014). Summary judgment is proper when "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). In reviewing the record, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Texas argues the district court erred in its analysis of Article III standing, of the relevant section of the Civil Rights Act of 1964, and of the First and Fourteenth Amendments. We address these issues in that order.

### I.    *Article III standing*

The parties briefed the issues of both Vote.org's possible organizational standing and its third-party standing. We start with a discussion of organizational standing.

We examine standing *de novo*. *United States v. $500,000.00 in U.S. Currency,* 591 F.3d 402, 404 (5th Cir. 2009). Associational standing is derivative of an organization's members. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Because Vote.org is a non-membership organization, it can assert only organizational standing. The requirements for organizational standing mirror those for individual plaintiffs. *Association*

*of Cmty. Org. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). An organization must demonstrate that (1) it suffered an injury in fact; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (citation omitted).

We first review whether Vote.org satisfies each of those requirements for organizational standing in a general sense, *i.e.*, without analyzing whether it has standing to bring *this* suit under Section 1983. That analysis will determine whether Vote.org has suffered an injury to itself that would be redressed if the suit were successful. We then analyze third-party standing to see if Vote.org can sue on behalf of prospective voters. Finally, we analyze whether Vote.org can bring its claims via Section 1983.

### a.    Injury in fact

Organizations can satisfy injury-in-fact for standing under two theories: associational standing and organizational standing. *OCA-Greater Houston*, 867 F.3d at 610. "An organization suffers an injury in fact if a defendant's actions 'perceptibly impair[]' the organization's activities and consequently drain the organization's resources." *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). A "setback to [an] organization's abstract social interests" is insufficient. *Havens*, 455 U.S. at 379. "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct." *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010).

Vote.org contends that, as a result of the Wet Signature Rule, it is no longer able to make use of its app and "has been diverting its limited resources to less effective (and less efficient) means of increasing turnout and

7

political engagement." Vote.org's CEO testified that the Wet Signature Rule caused it to shut down its app and impaired the organization's "ability to reach voters" and "to get people . . . to participate in elections." Moreover, because of the shutdown and concomitant drain on resources, Vote.org was "not [] able to do some of [the] innovative work" it pursues in other states, such as programs at historically black colleges and universities, other college programs, youth influencer programs, corporate organizing activities, and advocating for election day as a holiday. Indeed, Vote.org's CEO testified that the Wet Signature Rule took up significant staff time and resources across its engineering, partnership, and operations teams that could have been spent on other efforts. Vote.org contends this is enough to prove it has suffered an injury in fact.

Texas argues that organizational standing cannot be premised on "routine" responses to allegedly unlawful conduct. That concept originated in *City of Kyle*. There, we concluded that plaintiff home-builders associations had not shown how their response to certain ordinances "differ from [the home building associations'] routine lobbying activities." *Id.* at 238. We did not hold that resources spent on routine activities were necessarily irrelevant to the existence of standing, and our ultimate holding did not rely on that consideration. We held that plaintiffs lacked standing after faulting them for merely "conjectur[ing] that the resources that the HBA had devoted to the revised ordinances could have been spent on other unspecified HBA activities." *Id.* at 239.

Texas also relies on a precedent in which a community organization sought standing to challenge federal expenditures on a border wall. *El Paso Cnty.*, 982 F.3d at 336–37, 344. We found that record to be unclear as to whether the community organization's responses to border-wall construction "fall within the general ambit of its normal operations." *Id.* at 344. The organization's lack of standing was also based on its inability to

establish traceability and its reliance on a "single vague, conclusory assertion that the organization had to divert resources." *Id.*

The evidence here on diversion of resources is more detailed than in either *City of Kyle* or *El Paso County*. Vote.org has presented more than conjecture or a "conclusory assertion." It has provided substantial evidence that, because of the requirement for original signatures, it had to expend additional time beyond the routine activities of multiple departments and divert resources away from "particular projects." *El Paso Cnty.*, 982 F.3d at 344. That diversion "perceptibly impaired" Vote.org's ability to pursue its mission. *Havens*, 455 U.S. at 379.

### b.    Traceability

"An organization cannot obtain standing to sue in its own right as a result of self-inflicted injuries, *i.e.*, those that are not 'fairly traceable to the actions of the defendant.'" *Association of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). If an organizational plaintiff is asserting an injury caused by a need to divert its resources and actions, it must show that the change "result[ed] from counteracting the effects of the defendant's actions." *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). Any diversion must be a specific response to the challenged law or action. It is not fairly traceable to defendants if the diversion responded not only to the defendants' conduct but also to other forces. *Texas State LULAC v. Elfant,* 52 F.4th 248, 254 (5th Cir. 2022).

Vote.org's injury includes the continuing bar to the use of its app. The shutdown of the app was a "direct result of the challenged law." *Id.* at 254. As the Secretary's Rule 30(b)(6) designee explained, the "particular genesis" of the Wet Signature Rule was Vote.org's app. Moreover, several county registrars testified they would accept applications using Vote.org's

No. 22-50536

app if not for the Wet Signature Rule. It is the shutdown of the app, of course, that produced the diversion of resources described earlier.

Vote.org has met the traceability requirement. Texas does not challenge the redressability element of standing. Regardless, that requirement is plainly met. Relief from the requirement of original signatures on voter registration forms would allow Vote.org to offer its application again.

We thus conclude that Vote.org has organizational standing to seek redress for its own alleged injuries.

### c. *Third-party standing*

Even though we hold that Vote.org has a traceable injury redressable in litigation, its complaint asserts that the Wet Signature Rule violates the federal statutory and constitutional rights of voters.

Certainly, Vote.org itself is not a Texas voter. A party ordinarily may assert only "his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This is a prudential rule, though, not a constitutional one. *In re Deepwater Horizon,* 857 F.3d 246, 252 (5th Cir. 2017). We examine the possibility of third-party standing to assert claims of voters.

### 1. *Sufficiency of relationship between Vote.org and voters*

Vote.org sued under Section 1983 because of alleged violations of voters' rights under the Constitution and Section 10101. A necessary premise for the following analysis is that voters themselves have a right to bring such a suit. We will consider the validity of that premise later.

Third-party standing often turns on "categorized relationships" — *e.g.*, vendor-vendee, doctor-patient, employer-employee. 13A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3531.9.3 (3d ed. 2022).

10

Such standing "has become firmly established with respect to a number of easily categorized relationships. Vendors are routinely accorded standing to assert the constitutional rights of customers and prospective customers." *Id.* This treatise reached that conclusion after discussing a Supreme Court opinion invalidating a state law prohibiting beer vendors from selling to females under the age of 18 or to males under the age of 21. *Id.* (discussing *Craig v. Boren*, 429 U.S. 190, 195 (1976)). The initially underage plaintiffs aged out before the Supreme Court considered the appeal, but the Court allowed the case to proceed because the plaintiff beer vendor could reasonably assert the claims of prospective beer purchasers, as well as its own claims. *Craig*, 429 U.S. at 195. "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." WRIGHT & MILLER, FEDERAL PRACTICE § 3531.9.3 (quotation marks, citation, and alterations omitted); *see also Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020) (collecting cases).

We end where we began. Third-party standing is a *prudential* consideration. *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Judicial self-restraint is warranted to avoid making "unnecessary pronouncement[s] on constitutional issues" and "premature interpretations of statues." *Id.* at 955 (citation omitted). On the other hand, where a party can ensure that "issues . . . will be concrete and sharply presented," prudential concerns are less salient. *Id.* On these facts, Vote.org's position as a vendor and voting rights organization is sufficient to confer third-party standing.

To complete our multi-part examination of standing, we analyze whether Vote.org, as a non-voter asserting violations of voting rights, has a claim under Section 1983.

### 2.     *Third-party claims via Section 1983*

Section 1983 specifies that those acting under color of state law who subject "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable *to the party injured*." 42 U.S.C. § 1983 (emphasis added).  The claim here is that voters have been deprived of their rights under the Constitution and Section 10101, and that Vote.org itself has been injured.

Texas asserts that Section 1983's reference to "party injured" encompasses only the party "depriv[ed]" of its rights, not someone seeking to vindicate another's rights.  Section 1983 plaintiffs, though, often have been allowed to vindicate the rights of others.  We offer a few examples.  A bookseller was allowed to vindicate the First Amendment rights of book buyers under Section 1983.  *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988).  In *Craig*, a vendor invoked Section 1983 to assert the Fourteenth Amendment equal protection rights of its customers.  429 U.S. at 195; *see Walker v. Hall*, 399 F. Supp. 1304, 1306 (W.D. Okla. 1975), *rev'd sub nom. Craig v. Boren*, 429 U.S. 190 (confirming *Craig* was a 1983 action).  Finally, this court permitted a Section 1983 suit for a business that was asserting the First Amendment rights of its employees and customers. *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1251–52 (5th Cir. 1995).

Section 1983 is an appropriate vehicle for third-party claims.

### II.     *Voting Rights Section of the 1964 Civil Rights Act and Section 1983*

The parties dispute whether Section 10101 creates a private right of action.  They also dispute whether, even if a private right of action were created, it could be enforced using Section 1983.  We discuss both disputes.

### a.   *Private right enforceable under Section 1983*

The section on voting in the 1964 Civil Rights Act[2] established what is often called the Materiality Provision.  That provision prohibits denying the right to vote because of minor errors or omissions:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).  Section 10101 does not explicitly grant individuals the right to bring suit.  The only explicit right to sue is the one granted to the Attorney General.  § 10101(c).

A private cause of action may still be implied when a statute (1) contains rights-creating language and (2) displays "an intent to create a private remedy." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  If "a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.

### 1.   *Rights-creating language*

The first requirement is met when "the provision in question is phrased in terms of the persons benefitted" or has "an unmistakable focus on the benefited class." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599

---

[2] The more detailed and significant contemporaneous legislation on voting was the 1965 Voting Rights Act.  Pub. L. No. 89-110, 79 Stat. 437 (1965).  It is not involved in this litigation except to the extent of our relying by analogy on caselaw under that Act.

U.S. 166, 183 (2023) (quotation marks and citation omitted). There is strong "rights-creating" language in the first section of the statute:

> All citizens of the United States who are otherwise qualified by law . . . , shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

52 U.S.C. § 10101(a)(1). That statutory language has existed since 1870; it was the entirety of the section until the Civil Rights Act of 1957. Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140; *see* Historical and Statutory Notes, Codifications, 42 U.S.C.A. § 1971 (2012), at 145 (now 52 U.S.C. § 10101).

Several courts held there was a private right under the original section, though they were not using the much later *Gonzaga* test. Indeed, "from the enactment of § 1983 in 1871 until 1957, plaintiffs could and did enforce the provisions of § 1971 [now, § 10101] under § 1983." *Schwier v. Cox*, 340 F.3d 1284, 1295 (11th Cir. 2003) (collecting cases). One example of a suit brought by private plaintiffs under the pre-1957 statute concerned the refusal of local officials to allow a black man to vote. *See Smith v. Allwright*, 321 U.S. 649, 650–51 (1944). The plaintiff claimed that actions of local officials "violate Sections 31 and 43 of Title 8 of the United States Code," *id.*, which are now Section 10101 and Section 1983. Two other examples are from this court. In each, we held that a private party had a right to seek relief when the original 1870 language was the entirety of the statute. *See Reddix v. Lucky*, 252 F.2d 930, 931, 934 (5th Cir. 1958) (alleged violations occurred in 1956, before the 1957 amendment); *Chapman v. King*, 154 F.2d 460 (5th Cir. 1946) (private suit allowed).

In 1964, Congress added the Materiality Provision to what is now Section 10101. Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 78 Stat.

No. 22-50536

241. That amendment added language that also is written in terms of rights: "No person acting under color of law shall . . . *deny the right of any individual* to vote in any election because of an error or omission," etc. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). The new provision, subsection (a)(2)(B), identifies a specific means of denying the rights described in subsection (a)(1). We do not see that the focus on rights of Section 10101(a) is distorted by the enactment of a specific prohibition.

The phrasing of the Materiality Provision is similar to language the Court has held to confer a private right.[3] *See Gonzaga*, 536 U.S. at 284 & n.3. Moreover, the Materiality Provision neither has an "aggregate focus" nor does it "speak only in terms of institutional policy and practice." *Id.* at 288. It is true that the subject of the Materiality Provision is the regulating official — "no person acting under color of law," 52 U.S.C. § 10101(a)(2)(B) — not the person regulated by state law. The Supreme Court recently stated, though, that "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)." *Talevski*, 599 U.S. at 185. We agree with the Eleventh Circuit that, although "[t]he subject of the sentence is the person acting under color of state law, . . . the focus of the text is nonetheless the protection of each individual's right to vote." *Schwier*, 340 F.3d at 1296. Further, the Materiality

---

[3] For example, the Federal Nursing Home Reform Act provides that "nursing facilit[ies]" must "protect and promote" residents' "right to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." 42 U.S.C. § 1396r(c)(1)(A)(ii). It also requires "nursing facilit[ies]" to "not transfer or discharge [a] resident" unless certain enumerated preconditions are met. § 1396(c)(2)(A). The Supreme Court recently held that these provisions confer a private right. *Talevski*, 599 U.S. at 184–86.

No. 22-50536

Provision's language is decidedly more rights-focused than language the Court has held *not* to confer a private right.[4]

We conclude that Sections 10101(a)(1) and 10101(a)(2)(B) both confer an individual right.

### 2.    *Congressional intent to create a private remedy*

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284. Nonetheless, even when "a statutory provision unambiguously secures rights, a defendant 'may defeat t[he] presumption by demonstrating that Congress did not intend' that § 1983 be available to enforce those rights." *Talevski*, 599 U.S. at 186 (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005) (alterations omitted)). Different phrasing appears in *Gonzaga*: rebutting the presumption requires "showing that Congress specifically foreclosed a remedy under § 1983." *Gonzaga*, 536 U.S. at 284 n.4 (quotation marks and citation omitted).

In looking for rebuttal evidence, we explore a little more statutory history. In 1957, Congress amended the Civil Rights Act, granting enforcement power to the Attorney General of the United States. Civil Rights Act of 1957, Pub. L. No. 85-315, § 131, 71 Stat. 634, 637 (1957). The

---

[4] The Supreme Court held there was no private right in the Family Educations Rights and Privacy Act, which provides: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization." *Gonzaga*, 536 U.S. at 279 (quoting 20 U.S.C. § 1232g(b)(1)).

The Supreme Court also held Section 602 of the Civil Rights Act contained no rights-creating language because the statute "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating." *Sandoval*, 532 U.S. at 289.

amendment's text does not mention private actions.  The argument is that by explicitly granting authority to the Attorney General to enforce the Act, private rights were implicitly withdrawn.  We will examine the validity of that argument after explaining a few more details.

The 1957 amendment also added what is now 52 U.S.C. § 10101(d), which provides that all actions brought "pursuant to this section" can be exercised "without regard to whether the party aggrieved shall have exhausted administrative or other remedies that may be provided by law." Civil Rights Act of 1957, Pub. L. No. 85-315, § 131(d), 71 Stat. 637.  Critically in our analysis of whether granting enforcement authority had the effect of cancelling the private remedy, the "party aggrieved" reference is unlikely to refer to the Attorney General.  The House Report on the 1957 Act cites and discusses court opinions in which exhaustion of remedies had been required for *private* plaintiffs.  H.R. Rep. No. 85-291 (1957), 10–11, reprinted in 11984 U.S. CONG. SERIAL SET (1957).  The Eleventh Circuit found it to be illogical for Congress to have eliminated exhaustion requirements for private plaintiffs unless there were a corresponding private right.  *Schwier*, 340 F.3d at 1296.  We interpret these 1957 amendments as augmenting the implied but established private right to sue with an explicit right in the Attorney General.

We find no explicit foreclosure of a remedy under Section 1983.  To avoid recognition of a private right, the "defendant must show that Congress issued the same command implicitly, by creating 'a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Talevski,* 599 U.S. at 186 (quoting *Rancho Palos Verdes*, 544 U.S. at 120)).  Thus, we examine the enforcement scheme.

Several subsections of the statute detail the Attorney General's authority.  52 U.S.C. § 10101(c)–(e).  These elaborate statutory explanations of how enforcement by the Attorney General is to proceed certainly seem to

us to qualify as a "comprehensive scheme." Regardless of how comprehensive it is, though, use of Section 1983 is foreclosed only when the scheme is "incompatible" or "inconsistent" with Section 1983 enforcement. *Talevski*, 599 U.S. at 187. Of course, the first part of what is now Section 10101 was routinely enforced through Section 1983. *See Schwier*, 340 F.3d at 1295. That means there is a long history of *compatibility* between at least parts of Section 10101 and Section 1983 that predates the addition of the Attorney General enforcement in 1957. The details of the Attorney General's enforcement scheme create no conflicts with private suits under Section 1983.

Besides an incompatible enforcement regime, the Court has also explained that "the existence of a more restrictive *private* remedy for statutory violations" than what Section 1983 allows creates "the dividing line between those cases in which we have held that an action would lie under §1983 and those in which we have held that it would not." *Rancho Palos Verdes*, 544 U.S. at 121 (emphasis added). Section 10101 lacks any specific "private judicial right of action" or "private federal administrative remedy" that requires plaintiffs to comply with particular procedures. *Talevski*, 599 U.S. at 190. Thus, this exception to using Section 1983 is inapplicable.

With our review of the Supreme Court's relevant guidance behind us, we examine what other circuits have determined. Two circuits have held that the Materiality Provision creates a private right enforceable under Section 1983. *See Migliori v. Cohen*, 36 F.4th 153, 159 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *Schwier*, 340 F.3d at 1297. A third held that the Materiality Provision "is enforceable by the Attorney General, not private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000). We find no other circuit court to have addressed the issue. We will discuss all three opinions.

We have discussed *Schwier* to some extent already.[5] The components of the Eleventh Circuit's analysis included reliance on the caselaw allowing private suits under the pre-1957 version of this statute. *Schwier*, 340 F.3d at 1295. The court held that exhaustion of remedies would be irrelevant to Attorney General enforcement of the statute, yet the same amendment that added Attorney General enforcement to a statute that had for decades been used by private plaintiffs also made clear exhaustion was not required; exhaustion is irrelevant except as to private suits. *Id.* at 1296. That analysis is sound.

Undermined by later caselaw is the *Schnier*'s reliance on *Allen v. State Board of Elections*, 393 U.S. 544 (1969). *Id.* at 1294–95. *Allen* involved whether there was a private cause of action under Section 5 of the 1965 Voting Rights Act. *Allen*, 393 U.S. at 548. That section limited the right of States to change voting prerequisites. *Id.* The Court in *Allen* "reasoned that the goals of the statute were much more likely to be reached if private citizens were not 'required to depend solely on litigation instituted at the discretion of the Attorney General.'" *Schwier*, 340 F.3d at 1294–95 (quoting *Allen*, 393 U.S. at 556).

Almost five decades after *Allen* and one decade after *Schwier*, the Supreme Court declared that *Allen* and precedents like it too readily implied a cause of action in statutes and had largely lost their force because "the Court adopted a far more cautious course." *Ziglar v. Abassi*, 582 U.S. 120,

---

[5] In its first opinion, the Eleventh Circuit provided extensive analysis for its conclusion that there was a private right, then remanded to the district court for further proceedings because the district court had gone no further than holding there was no private right. *Schwier*, 340 F.3d at 1297. When the case returned to the circuit court, it said it would "affirm the district court's judgment for the reasons stated in the district court's memorandum opinion." *Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (citing *Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005)).

132 (2017). Instead, the key was whether there was congressional intent to create a private right. *Id.* at 133 (citing *Sandoval*, 532 U.S. at 286).

Regardless of the reliance on *Allen*, the *Schwier* court properly applied *Sandoval* and *Gonzaga* and identified the rights-creating language in what are now Sections 10101(a)(1) and (a)(2)(B). *Schwier*, 340 F.3d at 1296. The rights created "are specific and not amorphous," *i.e.*, they protect the right to vote when some immaterial information is not provided. *Id.* at 1296–97. The language of the Materiality Provision is also mandatory: "No person acting under color of law shall . . . deny the right of any individual to vote." *Id.* (quoting what is now Section 10101(a)(2)(B)). Those points, plus the reference to not needing to exhaust administrative remedies in the same amendment that added Attorney General enforcement powers, make a strong case for finding congressional intent to allow a private remedy.

The Third Circuit also held that the Materiality Provision created a private right presumably enforceable under Section 1983. *See Migliori*, 36 F.4th at 159.[6] "To rebut the presumption, a defendant must point to either specific evidence from the statute itself or a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 160 (quotation marks and citation omitted). The court found no evidence in the text of the statute to rebut the presumption nor a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* We agree with those conclusions.

The Sixth Circuit was the first circuit court to analyze whether there was a private right under the Materiality Provision, and it held there was not. *See McKay*, 226 F.3d at 756. This is the entirety of that court's analysis:

---

[6] The Supreme Court vacated *Migliori* and remanded to the Third Circuit with instructions to dismiss the case as moot. *Migliori*, 143 S. Ct. at 297–98.

> The district court correctly dismissed this claim for lack of standing. Section 1971 is enforceable by the Attorney General, not by private citizens. *See* 42 U.S.C. § 1971(c); *Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996).

*Id.*

Obviously, the Sixth Circuit considered the silence in the statutory language and the analysis of the cited district court to be sufficient. The cited district court opinion said little more than the Sixth Circuit did: "Section 1971 is intended to prevent racial discrimination at the polls and is enforceable by the Attorney General, not by private citizens." *Willing*, 924 F. Supp. at 820. In addition to the statutory language, the *Willing* court cited *Good v. Roy*, 459 F. Supp. 403, 405 (D. Kan. 1978). *Id.* That case was not even about the Materiality Provision, but it did refer to the statutory language that Section 1971 was to be enforced by the Attorney General. *Good*, 459 F. Supp. at 405. Neither the Sixth Circuit nor these two district courts wrestled with the considerations for implying a private right. Moreover, *McKay* predates the 2001 *Sandoval* opinion and the 2002 *Gonzaga* opinion.

We conclude that private enforcement via Section 1983 does not thwart Congress's enforcement scheme. Vote.org can seek a remedy for Section 10101 violations by way of Section 1983.

Finally — does Vote.org's claim have merit?

### III.    *Merits of the Materiality Provision claim*

Though we earlier quoted the Materiality Provision, we quote again for ready reference:

No person acting under color of law shall . . .

> deny the right of any individual to vote in any election because of an error or omission on any record or paper

relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

We need to interpret that provision. Statutory definitions often get us started. We have no such assistance, though, as the core term of "material" is not defined. The most-used legal dictionary gives this definition: "Of such a nature that knowledge of the item would affect a person's decision-making: significant; essential." *Material*, BLACK'S LAW DICTIONARY (8th ed. 2004). A more comprehensive dictionary has this definition: "Of serious or substantial import; significant, important, of consequence." *Material*, OXFORD ENGLISH DICTIONARY, III.6.a. (July 2023). We reject "essential" as a reasonable meaning, but the rest of the variations seem about right.

There is not much caselaw applying this provision. To some degree, then, we must set our own course. Should a district court, with some level of deferential review on appeal, decide as a *de novo* factual, legal, or mixed legal-factual question, whether a particular statutory provision is material in determining if a person is qualified to vote? Or, is some weight given to legislative judgment, which is not controlling perhaps but at least meaningful to some degree?

There is a constitutional challenge as well, for which considerable Supreme Court guidance exists. We will get to that.

The Section 10101(a)(2)(B) claim in this suit challenges a legislative judgment on the appropriate procedures for registering voters. A vendor wishing to facilitate voter registration contests a statutory requirement for an applicant's signature that the vendor's smartphone application cannot satisfy. Usually, a legislature would not need to revise statutes to allow a

private party to operate its business. Build a better app, the State might insist. Still, the Materiality Provision mandates that an error or omission in a requisite for voting be material before the requirement can be enforced. Here, if an application received by a registrar is to be rejected, even when the reasons for the error or omission are limitations in Vote.org's app, we accept (in the absence of any contrary argument) that materiality must be shown.

We will proceed in the following order. First, we consider the limited caselaw from other circuit courts. Second, we analyze whether some weight should be given to Texas's legislative judgment as to the utility of the contested provision. Third, we explore in some depth a factor that the Supreme Court has identified as relevant in voting rights claims. Finally, we pull those strands together as we determine the merits of the claim here.

### a.     Other circuits' interpretations

We again review the few circuit court opinions that analyze the Materiality Provision. We already discussed those opinions insofar as they addressed whether the statutory language created a private right enforceable through Section 1983. We return to the two opinions that found a private right and review their analysis of materiality.

The Eleventh Circuit's 2006 opinion considered whether it was permissible for Georgia to require registrants to provide a Social Security number. *Schwier*, 439 F.3d at 1286. The circuit court affirmed for the reasons the district court had stated in its opinion. *Id.* We therefore review the district court's analysis.

One issue, not present in our dispute, was the effect of the Privacy Act, 5 U.S.C. § 552a, on requiring Social Security numbers. *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). The district court found that requiring this unique number could help "prevent voter fraud," but concluded that the Privacy Act nevertheless

proscribed its necessity. *Id.* As to our issue of materiality, the court held that having a Social Security number was not one of the qualifications for a voter under Georgia law, and that meant requiring its disclosures to vote could not be material when determining whether an applicant was qualified. *Id.*

We do not find *Schwier* directly applicable. Georgia was insisting on a manner of voter identification that added to the statutory qualifications for voting, namely, that a voter have a Social Security number.

Much more recently, the Third Circuit in 2022 evaluated whether a Pennsylvania law requiring a voter to write a "date on the outside of a mail-in ballot . . . is material to the voter's qualifications and eligibility to vote." *Migliori*, 36 F.4th at 156.[7] As with any out-of-circuit precedent, we consider the opinion's persuasiveness. We do that here even though the Supreme Court vacated the opinion. *Migliori*, 143 S. Ct. at 298. For mail-in voting in Pennsylvania, a prospective voter was sent a ballot and a return envelope; a declaration was printed on the envelope that was to be signed and dated. *Id.* at 157. The envelopes containing the contested ballots were not dated. *Id.* The court began its analysis by looking to Pennsylvania's substantive voting requirements, including age and residency. *Id.* at 162–63. The State argued, in part, that dating the envelope helped to deter fraud. *Id.* at 163. The court

_____

[7] We earlier explained that a majority of the Supreme Court vacated *Migliori* because it held that the case was moot. *See supra* note 6. One explanation for mootness is that after the Third Circuit ordered that the disputed ballots be counted, "the election was certified. Then, essentially because plaintiffs had won, the Supreme Court vacated the Third Circuit's decision." David Herman, *Reviving the Prophylactic VRA: Section 3, Purcell, and the New Vote Denial*, 132 YALE L.J. 1462, 1478 n.91 (2023).

Justice Alito, writing for three dissenting justices, concluded the Third Circuit's application of the Materiality Provision was "very likely wrong." *Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (2022) (Alito, J., dissenting). We find Justice Alito's analysis largely dependent on difficulties of applying the Materiality Provision to vote counting. That possibly overbroad application of the Materiality Provision is not involved here.

explained that "[f]raud deterrence and prevention are at best tangentially related to determining whether someone is qualified to vote." *Id.* Moreover, "whatever sort of fraud deterrence or prevention this requirement may serve, it in no way helps the [State] determine whether a voter's age, residence, citizenship, or felony status qualifies them to vote." *Id.* The court ultimately concluded that the date requirement violated the Materiality Provision. *Id.* at 164.

Of course, the only issue was whether a *date* on an envelope in which a ballot was returned to the proper officials was material to the qualifications to vote. None of the votes in dispute arrived after the election, *id.* at 157, so the date was not needed as evidence that the votes were timely cast.

A signature was also required on the envelope, and that requirement was uncontested. The signature was to be next to a declaration on the envelope, which included "a statement of the elector's qualifications, together with a statement that the elector has not already voted in the primary or election." 25 Pa. Stat. § 3150.14(b). An original versus an alternative form of signature was also not in question.

The immateriality of the omissions in those two decisions was fairly obvious. Overall, nothing in *Schwier* and *Migliori* causes us to question a State's requiring a signature in some form on documents relating to voting. Indeed, the Texas requirement of a signature is not challenged in this case. Only its form is contested — original versus an alternative that would allow Vote.org to provide its services.

b.     *Weight of legislative judgments in general*

For a successful claim of immateriality, the statutory text requires that the "error or omission" — here, the absence of an original signature on a voter application — not be material in determining qualifications to vote. Some requirements for a voter application could easily be dismissed as

immaterial, while others could as easily be upheld as material. The requirement of an original signature is not in either category.

Among the questions for us to answer is the weight that should be given to the State's legislative judgment. This is not a constitutional claim necessitating the application of a balancing test that we will analyze later in addressing a First Amendment claim. We do draw from that caselaw, though, that States have considerable discretion in establishing rules for their own elections. The Supreme Court recognizes a "general rule that evenhanded restrictions that protect the integrity and reliability of the electoral process itself are not invidious" and may be upheld at least against a constitutional attack. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (quotation marks and citation omitted). *Crawford* was a facial challenge to an Indiana statute requiring a prospective voter to present at the polls one of a wide range of photo identifications. *Id.* at 185. The plaintiffs alleged the measure was a "violation of the Fourteenth Amendment; that it is neither a necessary nor appropriate method of avoiding election fraud." *Id.* at 187. The Court conceded that the requirement had sharply divided the Indiana legislature on a partisan basis, and whether this was "the most effective method of preventing election fraud may well be debatable." *Id.* at 196. What was not debatable was "the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* The Court upheld the state measure without deciding what the most effective means to prevent fraud would be.

*Crawford* is only the latest example in which the Court acknowledged the significance of a State's authority to set its electoral rules and the considerable deference to be given to election procedures so long as they do not constitute invidious discrimination. The Court has explained that "substantial regulation of elections" is necessary incident to a "fair and honest . . . democratic process[]." *Anderson v. Celebrezze*, 460 U.S. 780, 788

(1983) (citation omitted). Consequently, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* The Court has emphasized that when election regulations "impose[] only reasonable, nondiscriminatory restrictions," "the State's important regulatory interests" will usually "justify [those] restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quotation marks and citation omitted). Indeed, a "State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted).

We have had our own cases that, like *Crawford*, analyze a photo identification requirement for voters. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*). *Veasey* involved claims brought both under the Constitution and under the following Voting Rights Act provision that invalidate rules denying or abridging the right to vote based on race:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

52 U.S.C. § 10301(a). The *Veasey* court found little guidance on how to analyze a claim that "the right to vote has been *denied* or *abridged* on account of race." 830 F.3d at 244 (emphasis in original). We examined the Supreme Court's factors that were first "enunciated by Congress to determine whether [a discriminatory] impact is a product of current or historical conditions of discrimination such that it violates Section 2." *Id.* (citing *Thornburg v. Gingles*, 478 U.S. 30, 44–45 (1986)). The Supreme Court quite recently reaffirmed the central role of the *Gingles* factors in disputes under

Section 2 of the Voting Rights Act. *See Allen v. Milligan*, 599 U.S. 1, 17–19 (2023).

In considering this appeal, we also, like our court in *Veasey*, have found little guidance on analyzing the materiality of a requirement for registering to vote. Failing to register will deny a right to vote. The 1964 Materiality Provision for registration to vote only slightly predates the 1965 Voting Rights Act and can be considered a precursor in many respects. That makes the Supreme Court's guidance on applying the Voting Rights Act of relevance to the earlier, quite narrow provision on voting.

As we structure our own approach, we explain why the Materiality Provision — even though it was in the first section of the 1964 *Civil Rights Act*[8] — is not limited to claims that immaterial requirements for voter registration discriminate on the basis of race. The House Report on the Act stated that the provision was a response to practices in many states that treated blacks seeking to register to vote differently than whites. Civil Rights Act of 1963, H.R. Rep. No. 88-914 (Nov. 20, 1963), Part 2, at 5, reprinted in 12544 U.S. CONG. SERIAL SET (1963). All three provisions that are now Sections 10101(a)(2)(A)–(C) were adopted to attack the problem. Subsection (A) requires any practice applied to one individual to be applied to all. Subsection (C) prohibits literacy tests, which were applied to discriminate against Blacks. Together with the Materiality Provision of subsection (B), these three provisions were a formidable barrier to a continuation of discriminatory practices. Surely, Congress anticipated in 1964 that usually the claim would be of racial discrimination. Thus, in deciding the proper considerations for a claim under the Materiality

---

[8] The Materiality Provision was one of three subsections, all dealing with voting, comprising the first section of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 78 Stat. 241.

Provision, the existence of racial discrimination generally will be relevant though, in light of the text of the provision, not essential. The provision was written in a somewhat over-inclusive form to capture well-disguised discrimination. We later discuss Texas's argument that, by not requiring proof of racial discrimination, the provision is unconstitutional.

Now, back to *Veasey*. The two factors we selected there from *Gingles* were the ones uniquely relevant to examining claims of vote *denial*. *Veasey*, 830 F.3d at 244. We distinguished vote denial claims from those of vote dilution, the latter often seen in legislative redistricting cases where the *Gingles* factors are applied in full. *Id.* If the claim is that the right to vote has been denied or abridged on account of race, these factors are relevant:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, [and]

> [2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Id.* (alterations in original) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014)).

Those two factors, though not focused on the significance of a voting requirement, could also be relevant to a Materiality Provision claim when racial discriminatory effects are alleged. Vote.org's brief argued that the challenge of providing an original signature is "particularly acute for young adults, low-income voters, and minorities." We find insufficient evidence or argument, though, to conclude that Vote.org has claimed racial discrimination. Indeed, the State argues that Vote.org's claims fail because

they are not about racial discrimination. We explain later that the Materiality Provision does not require proof of racial discrimination. We similarly reject that Vote.org's claims are for racial discrimination. Perhaps, though, *Gingles* has useful guidance for a claim that a particular "application, registration, or other act requisite to voting" is material. 52 U.S.C. § 10101(a)(2)(B).

Of the other seven *Gingles* factors, we find one that is directly applicable in analyzing a State's justifications for the materiality of a practice: "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Veasey*, 830 F.3d at 246 (quoting *Gingles*, 478 U.S. at 37). "Tenuous" suggests an absence of a strong connection between the policy and the requirement. *See id.* at 262. Thus, if the policy or justification for the requirement is merely tenuous, that is a factor in favor of invalidating the requirement. On the other hand, how does a connection that is more than tenuous affect our analysis? We explore tenuousness next.

### c.     *Tenuousness*

To understand the factor of tenuous connections, we examine one of our opinions from two decades before *Veasey*. The discussion was in a case about Texas's long-time practice of electing judges county-wide. *See League of United Latin Am. Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993). All voters in a populous county would elect numerous judges to serve on the same local court with county-wide jurisdiction, but the plaintiffs sought to have elections from smaller, single-judge districts. *Id.* at 837–38. The Supreme Court had reversed and remanded our earlier decision that the Voting Rights Act did not even apply to judicial elections. *See Houston Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419, 423–24, 428 (1991). Though the Act applied, the Supreme Court acknowledged that Texas had a legitimate interest in linking a judge's jurisdiction to the same geographical area as the

one in which the judge's voters resided. *Id.* at 426. Moreover, the "State's justification for its electoral system is a proper factor for the courts to assess in a racial vote dilution inquiry, and the Fifth Circuit has expressly approved the use of this particular factor in the balance of considerations." *Id.* at 426–27 (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (1973), *aff'd sub nom. East Carroll Par. Sch. Bd. v. Marshall*, 424 U.S. 636 (1976)).

This cite to *Zimmer* is significant, for that is a source for the *Gingles* Court's adoption of factors to consider in vote-dilution cases. *Gingles*, 478 U.S. at 36 n.4. The "particular factor" cited with approval by the *Houston Lawyers'* Court was whether the State's policy behind a requirement was tenuous. *Houston Lawyers'*, 501 U.S. at 426–27. The Court remanded to us for further proceedings, making clear that the State's justifications for maintaining a particular electoral scheme was only one factor to consider. *Id.*

On remand, we discussed the consideration of the tenuousness of a State's justifications in some detail. We concluded that, "while the Supreme Court rejected the contention that the linkage interest in all cases defeated liability under § 2,[9] the Court endorsed the position that the linkage interest is relevant to a determination of liability." *League of United Latin Am. Citizens*, 999 F.2d at 870. By "linkage interest," we were referring to the State's interest in linking a judge's jurisdiction to the same area as the judge's electoral base. *Id.* at 869. We identified the issue for determination as deciding "when the linkage interest will outweigh other factors and defeat liability under § 2." *Id.* at 870. Some of our analysis was specifically about the State's interest in that linkage, which our court saw as far more than

---

[9] Section 2 of the Voting Rights Act is codified as 52 U.S.C. § 10301. It prohibits imposition of a "voting qualification or prerequisite to voting" that "results in a denial or abridgement of the right . . . to vote on account of race or color." § 10301(a). "A violation of subsection (a) is established" under a "totality of the circumstances" test. § 10301(b).

tenuous. The policy has "additional and distinct relevance because it advances objectively substantive goals." *Id.* Useful, more general analysis was also given.

Our resolution of the issue included quoting the Supreme Court "that the linkage interest does not 'automatically, and in every case, outweigh proof of racial vote dilution.'" *Id.* (quoting *Houston Lawyers'*, 501 U.S. at 427). "We also reject[ed] the position of plaintiffs that the linkage interest can never defeat liability under the totality of circumstances if 'illegal' dilution is otherwise established." *Id.* More generally, "[t]he weight, as well as tenuousness, of the state's interest is a legitimate factor in analyzing the totality of circumstances." *Id.* at 871. Our reference to "totality" borrowed from Section 2 of the Voting Rights Act and the Supreme Court's holding that the State's interest in a voting measure "is a legitimate factor to be considered by courts among the 'totality of circumstances' in determining whether a § 2 violation has occurred." *Houston Lawyers'*, 501 U.S. at 426; 52 U.S.C. § 10301(b). We also stated that "[t]he substantiality of the state's interest has long been the centerpiece of the inquiry into the interpretation of the Civil War Amendments and their interplay with the civil rights statutes." *League of United Latin Am. Citizens*, 999 F.2d at 871. As to the policy in that case, we held that the State's interest in linking judges' electoral districts to the geographical areas over which they had jurisdiction was substantial and overrode the evidence of some vote dilution. *Id.* at 876.

The principles stated by our court that are relevant here were these:

(1) "[T]he principal probative weight of a tenuous state policy is its propensity to show pretext." *Id.* at 870 (quoting *Terrazas v. Clements*, 581 F. Supp. 1319, 1345 n. 24 (N.D. Tex. 1983) (three-judge court)).

(2) "Proof of a merely non-tenuous state interest discounts one *Zimmer* factor, but cannot defeat liability." *Id.* at 871.

(3) "[P]roof of a *substantial* state interest" may defeat liability even if some vote dilution results. *Id.*

(4) "The issue of substantiality" of the State's interest "is a legal determination." *Id.*

These opinions regarding election of judges were applying Section 2 of the Voting Rights Act. That provision prohibits "denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). The Materiality Provision similarly prohibits denial of the right to vote due to an immaterial error or omission in some "act requisite to voting." § 10101(a)(2)(B). Because the State's justification for its practice is relevant even in a claim that a voting requirement has racially discriminatory effects and some weight is given to the State's judgment so long as that policy is more than tenuous, we hold that similar considerations apply to the Materiality Provision.

We thus need to examine the State's policy and its connection to original signatures. We draw from our earlier discussion of *Crawford.* There we quoted the Supreme Court's giving weight to the legislature's judgment in creating "evenhanded restrictions that protect the integrity and reliability of the electoral process." *Crawford*, 553 U.S. 189–90 (quotation marks and citation omitted). "Evenhanded" is a synonym for nondiscriminatory. The *Crawford* Court upheld the State's remedy to protect against voter fraud — photo identification — even though evidence of voter fraud was scant and the most effective means of combatting any fraud that existed was "debatable." *Id.* at 195–96. Obviously, then, a State has considerable discretion in deciding what is an adequate level of effectiveness to serve its important interests in voter integrity. When we evaluate the materiality of a measure, we must give weight to the State's justification for it.

Application of the tenuousness factor can be seen as involving two steps. The first is determining if the connection between policy and requirement is only tenuous. If it is, then the factor supports invalidating the requirement. To avoid a finding of tenuousness, "there cannot be a total disconnect between the State's announced interests and the statute enacted." *Veasey*, 830 F.3d at 262. There must be some measure of "fit between the expressed policy and the provisions of the law." *Id.* Tenuousness might be found, for example, where a law "fail[s] to correspond in any meaningful way to the legitimate interests the State claims to have been advancing." *Id.* at 263. Indeed, there must be more than a "dubious connection between the State's interests" and the challenged law. *Id.*

The second step is taken if the connection between a measure relating to voting and its justification is more than tenuous. That does not mean the measure is upheld. Instead, under the totality of circumstances, we consider whether a provision meaningfully corresponds to "legitimate interests the State claims to have been advancing." *Id.* By "meaningful" and "legitimate" we mean that the measure advances that interest without imposing pointless burdens. Specifically, we ask: (1) how substantial is the State's interest in the "requisite to voting" in which some "error or omission" exists; (2) does that interest relate to "determining whether such individual is qualified under State law to vote in such election"; and (3) under the totality of the circumstances, what is the strength of the connection between the State's interest and the measure, *i.e.*, how well does the measure advance the interest? *See* 52 U.S.C. § 10101(a)(2)(B). "The issue of substantiality" of the State's interest "is a legal determination." *League of United Latin Am. Citizens*, 999 F.2d at 871.

### d.     *Materiality of an original signature*

With this caselaw in hand, we now analyze Texas's arguments to overturn the district court's holding that the absence of an original signature on a voter registration form was an immaterial omission.

Texas's first argument is that the Materiality Provision requires a showing of racial discrimination. To hold otherwise, Texas says, presents constitutional problems. We discussed earlier why the Materiality Provision was not written in terms of racial discrimination.[10] The key words and phrases are "error or omission," "right of *any individual* to vote," "on any record or paper," "application, registration," and "not material in determining whether such individual is qualified" to vote. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). No suggestion of a requirement of racial discrimination exists in any of that language.

Though it is clear that the target of the Materiality Provision was racial discrimination, the manner chosen to capture the hard-to-predict variations in "trivial reasons" was by broadly "prohibiting the disqualification of an individual because of immaterial errors or omissions." Civil Rights Act of 1963, H.R. Rep. No. 88-914 (1963), Part 1, at 19, reprinted in 12544 U.S. CONG. SERIAL SET (1963). Thus, the Materiality Provision is not textually limited to protecting only one race of voters in order to more effectively reach subtle forms of racial discrimination, *i.e.*, requirements that are pretexts for racial discrimination.

---

[10] Elsewhere in Section 10101, Congress did plainly express this need. Section 10101(a)(1) provides that "[a]ll citizens . . . who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote . . . without distinction of race." 52 U.S.C. § 10101(a)(1). When Congress "includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (alteration in original) (citation omitted).

No. 22-50536

This understanding of the broader language is expressed in one of the few scholarly articles on the Materiality Provision. Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 WM. & MARY L. REV. 83 (2012). "Though the primary motivation for the sponsors of the materiality provision was clearly the confrontation of racial discrimination, Congress drafted the provision to embrace errors or omissions beyond those used to discriminate based on race." *Id.* at 148. While "the text of most other sections of the Civil Rights Act of 1964 ties the relevant right in question to racial discrimination," *id*. at 149 & n.216, Congress did not place that limitation in the Materiality Provision.

Though we find it reasonable that omitting any reference to racial discrimination in this provision made it more effective in combatting that scourge, there remains the issue of whether Congress had authority to legislate so broadly. Understanding the scope of the problem Congress sought to rectify, we must decide whether the Materiality Provision was a "congruen[t] and proportional[]" exercise of power under the Fourteenth and Fifteenth Amendments.[11] *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

"Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 721–22 (2003). The *Boerne* Court quoted Justice Harlan's 1970 conclusion that Congress may prohibit all literacy tests under the Fifteenth Amendment

---

[11] The Supreme Court has not decided whether legislation enacted under the Fifteenth Amendment on voting rights must be "congruen[t] and proportional[]" or simply a "rational means" of executing a constitutional prohibition. *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009). The Materiality Provision satisfies either test.

because they "unduly lend themselves to discriminatory application." *Boerne*, 521 U.S. at 526 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 216 (1970) (Harlan, J., concurring in part)).  We apply that reasoning here to prohibit those acting under color of law from using immaterial omissions, which were historically used to prevent racial minorities from voting, from blocking any individual's ability to vote — irrespective of racial animus.  That prohibition is a congruent and proportional exercise of congressional power.

Next, Texas argues that requiring an original signature does not "deny the right of any individual to vote," quoting Section 10101(a)(2), because (1) the requirement is part of an expansion of registration methods; (2) rejected applicants are offered a chance to cure the deficiency; and (3) there are other registration methods apart from fax.

We cannot agree that if the relevant restriction on voting is packaged with expansions, the restriction must be valid.  Less clear is the effect of a simple means to cure.  This court's motions panel decided that because the absence of an original signature on the initial application still allows registration through alternative means, the requirement was not a denial of the right to vote.  *Vote.org*, 39 F.4th at 306.  We set aside that holding.  It is true that the immaterial requirements some of the State's voting registrars were using when this provision was adopted left no alternatives, from simple misspellings to requiring Black applicants to analyze long sections of the Constitution.  *See* H.R. Rep. 88-914 (1963), Part 2, at 5.  Our doubt about the efficacy of an *ability* to cure is that the *need* to cure an immaterial requirement creates a hurdle for — even if it is not itself a final denial of — the right to vote.  That issue is left open for a later case.  We do not rely today on the fact alternatives exist if the initial registration fails.

The State also seemingly argues that any requirement in State law that is a prerequisite to voting is "material" because it is, by definition, a

component of someone's qualifications to vote.  The argument is that "in Texas, an individual is qualified to vote only if she is registered and to register via fax she must comply with the [W]et [S]ignature [R]ule."  Thus, Texas concludes, the Wet Signature requirement is "material" because without a wet signature, a "person is not qualified to vote under state law."

We reject that States may circumvent the Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote and therefore "material."  The Materiality Provision is a standard that a State's voter registration requirements must satisfy.  The central question here is whether an original signature is material to "determining whether such individual is qualified" to vote, giving weight to the State's policy for the provision unless it is too tenuous.

Now that we have rejected the arguments that would avoid actually analyzing the materiality of an original signature, we examine what Texas argues makes an original signature material.

To restate, Section 10101(a)(2)(B) refers to matters that are material in deciding whether an "individual is qualified under State law to vote."  What makes an individual qualified to vote under Texas law?  By statute, there are age, citizenship, residency, capacity, and criminal history qualifications. TEX. ELECT. CODE § 11.002.  There are similar qualifications for eligibility to register.  § 13.001.  Undeniable, though, is a premise for all the statutory qualifications:  Are the individuals who are trying to register actually who they say they are?  Texas argues that requiring an original signature assists in meeting this voting qualification.

Voter identification was the subject of the Supreme Court's opinion we discussed earlier that approved Indiana's photo identification law. *See Crawford*, 553 U.S. at 204.  Even in our *en banc Veasey* opinion that invalidated a statutory requirement for voter identification, we found "[t]he State's

stated purpose in passing [a voter-identification statute] centered on protection of the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process. No one questions the legitimacy of these concerns as motives." *Veasey*, 830 F.3d at 231. After remand and a revision in the law, we upheld the requirements. *Veasey v. Abbott*, 888 F.3d 792, 796, 802–03 (5th Cir. 2018).

Voter integrity is the principal justification that Texas argues to support the requirement of an original signature. As a matter of law, we conclude that is a substantial interest. Is that substantial interest, though, more than tenuously connected to the requirement of an original signature?

Texas says it is. It argues that an original signature helps assure that an applicant meets the substantive requirements to vote that are listed above where the signature is to be placed. The following statements appear directly above the signature block in the registration forms in this record:

> I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all <u>three</u> statements to affirm before signing.

> I am a resident of this county and a U.S. citizen;

> I have not been finally convicted of a felony, or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and

> I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

Screenshots taken using Vote.org's app reveal that users did not see those notices when they completed their applications. The first paragraph of

warnings concerning perjury, imprisonment, and fines is required by statute to appear on the application form. *See* TEX. ELECT. CODE § 13.122(a)(1), (13). The form also may contain any information "considered appropriate and required by the secretary of state." § 13.122(a)(14). These statements affirm the substantive qualifications needed to vote under Texas law. *See* § 11.002.

It is true that no statute requires those warnings to appear next to where a voter is to sign; distance between the two would potentially dilute the wet signature's effectiveness. One statute, though, requires the Secretary of State to "have the official application forms for registration by mail printed" and mandated that the Secretary would "furnish the forms without charge to each registrar." § 13.121(c). A copy of that form was attached to Texas's motion for summary judgment. The space for a signature is in the same numbered block of the form as the warnings and directly below them. Even though the requirements that the form contain the warnings and that it be completed with an original signature are in different statutory sections, it is reasonable to assume the legislature knew the structure of the form when it decided in 2021 to require an original signature.

We accept what Texas is arguing now, that a reasonable understanding of the legislative judgment is that physically signing the form with the warnings in front of the applicant, threatening penalties for perjury and stating the needed qualifications, has some prospect of getting the attention of many applicants and dissuading false statements that an electronic signature, without these warnings, does not. Even beyond the appearance of the printed warnings, Texas insists — echoing the motions panel — that applying an original signature to a voter registration form carries "solemn weight" that an imaged signature does not. *Vote.org*, 39 F.4th at

308. Texas is allowed to have doubts about technological substitutes, at least when those doubts fit within the strictures of the Materiality Provision.

Signing an application is related to voting qualifications. The district court agreed: "Texas provides abundant evidentiary and legal support for the conclusion that a signature is important and vital to determine a voter's qualification to vote." *Vote.org*, 609 F. Supp. 3d at 529. The district court faulted Texas for "fail[ing] to show or explain why a *wet signature* is required in this instance to determine the registrant's qualification to vote." *Id.* (emphasis in original). Thus, the district court accepted the validity of requiring a signature, just not an original one when a registrant wanted to use Vote.org's services.

Vote.org makes several criticisms of the effectiveness of an original signature to deter fraud and of the consistency by which Texas imposes that requirement. For example, Vote.org insists that original signatures are, in practice, not used to verify anyone's identity or to check for fraud. Vote.org also refers to evidence that some of the county defendants conceded that there is no practical difference between an original signature and an electronic one. Moreover, Vote.org highlights that Texas accepts digital signatures in other contexts, such as when individuals register to vote at the Department of Public Safety.

Our resolution comes down to whether requiring an original signature meaningfully, even if quite imperfectly, corresponds to the substantial State interest in assuring that those applying to vote are who they say they are. Is there a strong enough connection to overcome the possible denial of registration to some applicants? We must give weight to a state legislature's judgment when it has created "evenhanded restrictions that protect the integrity and reliability of the electoral process." *Crawford*, 553 U.S. 189–90. Does giving weight to that judgment allow us to conclude that an original

signature is material to deciding the applicant's identity — the most basic qualification to vote? Does it have "serious or substantial import"? *Material*, OXFORD ENGLISH DICTIONARY, III.6.a. Does requiring an applicant to provide an original signature on the form with the attendant warnings and explanations "affect a person's decision-making"? *Material*, BLACK'S LAW DICTIONARY.

We answer, first, that Texas's interest in voter integrity is substantial. Second, that interest relates to the qualifications to vote — are the registrants who they claim to be? Finally, most voter registration forms likely are completed far from any government office or employee. That limits the methods of assuring the identity of the registrant. Though the effect on an applicant of seeing these explanations and warnings above the signature block may not be dramatic, Texas's justification that an original signature advances voter integrity is legitimate, is far more than tenuous, and, under the totality of the circumstances, makes such a signature a material requirement.

### IV.  *First Amendment claim*

Vote.org also brought a First Amendment claim. "Where a state election rule directly restricts or otherwise burdens an individual's First Amendment rights, courts apply a balancing test derived from two Supreme Court decisions, *Anderson* [*v. Celebrezze*, 460 U.S. 780 (1983)], and *Burdick v. Takushi*, 504 U.S. 428 (1992)." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013). The *Anderson-Burdick* rule requires courts to weigh the "character and magnitude of the asserted injury" against the "precise interests put forward by the State," "taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Burdick*, 504 U.S. at 434). If a "severe burden on First Amendment rights" is created, the state rule "must be narrowly drawn to advance a state interest of compelling importance. Lesser burdens, however, trigger less

exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (quotation marks and citations omitted).

The district court, focusing on the original signature requirement in isolation, found that it imposed a burden that is "more than slight." Texas argues that looking at the Rule in a vacuum was error; instead, the court should have considered the panoply of registration options available to Texas voters. In one of our opinions, we evaluated Supreme Court precedents and explained that "the severity analysis is not limited to the impact that a law has on a small number of voters." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020) (examining *Crawford*, 553 U.S. 181). Vote.org cites a Sixth Circuit case for the proposition that restrictions should be looked at only "from the perspective of [the] affected electors." *Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020). *Mays*'s statement, however, was confined to laws that effect "disparate treatment" because they are *facially* discriminatory. *Id.* at 785. By contrast, the Wet Signature Rule here is generally applicable. *Cf. Crawford*, 553 U.S. at 207 (Scalia, J., concurring in the judgment) ("[A] generally applicable law with disparate impact is not unconstitutional.").

The original signature requirement, then, must be viewed in light of other available registration options, including submissions via Department of Public Safety, direct mail, personal delivery, and volunteer deputy registrars. TEX. ELEC. CODE §§ 13.002(a), 13.031, 13.038, 13.041. Accounting for these other options, the burden imposed by the requirement is only "slight." *Crawford*, 553 U.S. at 191.

Texas argues that the requirement advances the State's interest in multiple respects. It guarantees that registrants attest to meeting the qualifications to vote and impresses upon registrants "the seriousness" of

registering.  It also ensures security and reliability that a third-party app, Texas says, cannot provide.

Texas's interests in reliability and fraud deterrence are "legitimate." *Id.* at 191, 196.  As described above, original signatures may dissuade improper individuals from registering.  Further, Texas may prefer the uniformity that original signatures provide, especially if that uniformity produces signatures that are "superior" and less prone to technical defects than those gathered by third-party apps.  That Texas allows electronic submissions via the Department of Public Safety does not necessarily alter the calculus.  Texas exerts more control over and may legitimately have more confidence in that department's systems.

Where the challenged law "imposes only a limited burden," the constitutional inquiry grants state governments considerable leeway.  *See id.* at 203.  Texas's interests in ensuring reliability and reducing fraud are "sufficiently weighty" to protect the Wet Signature Rule from constitutional attack.  *See id.* at 190–91.

We REVERSE and RENDER judgment for the defendants.

No. 22-50536

Stephen A. Higginson, *Circuit Judge*, dissenting:

I agree in large part with the majority opinion's analysis.  I agree with the panel majority that Vote.org has Article III standing; that it can privately enforce section 101 of the Civil Rights Act of 1964 (the "Materiality Provision"), 52 U.S.C. § 10101(a)(2)(B); that a Materiality Provision claim does not require evidence of racial discrimination; that a chance to cure rejected applications does not render an immaterial provision material; and that a state may not circumvent the Materiality Provision by defining any trivial requirement as a "material" qualification to vote.  But I cannot agree that Texas's "wet signature" requirement[1]—which Texas officials conceded serves "no practical purpose"—is "material in determining whether [a Texan] is qualified under [Texas] law to vote."   52 U.S.C. § 10101(a)(2)(B).  Because Texas's wet-signature requirement violates the Materiality Provision, I must therefore respectfully dissent.

The district court aptly described Vote.org's mission and outreach activities as including: "(1) us[ing] technology to simplify political engagement, increase voter turnout, and strengthen American democracy; (2) work[ing] to support low-propensity voters, including racial and ethnic minorities and younger voters who tend to have lower voter-turnout rates; and (3) help[ing] Texans register to vote and verify registration status." Vote.org's app "is critical to ensure that voters with limited access to

---

[1] Like the parties and the majority, I will refer to § 13.143(d-2) of the Texas Election Code as the "wet signature" requirement.  Section 13.143(d-2) provides:

> For a registration application submitted by telephonic facsimile machine to be effective, a copy of the original registration application containing the voter's original signature must be submitted by personal delivery or mail and be received by the registrar not later than the fourth business day after the transmission by telephonic facsimile machine is received.

Tex. Elec. Code Ann. § 13.143(d-2) (West 2023).

printers or mailing facilities, or who otherwise need assistance to register to vote, have meaningful opportunities to do so." Complaint at 4, *Vote.org v. Callanen*, 609 F. Supp. 3d 515 (W.D. Tex. 2022) (No. 5:21-CV-649), ECF No. 1. Vote.org seeks to maximize registration of Americans eligible to vote, yet its effort to engage Americans in self-government faces legal hurdles around the country. *See, e.g.*, *Vote.org v. Ga. State Election Bd.*, No. 1:22-CV-01734-JPB, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023); *Vote.org v. Byrd*, No. 4:23-cv-111-AW-MAF (N.D. Fla. June 13, 2023).

I.

The majority invokes a line of constitutional vote-denial cases, including *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), for the proposition that "[s]tates have considerable discretion in establishing rules for their own elections." Op. 26-27 (citing *Crawford*, 553 U.S. 181; *Anderson v. Celebrezze*, 460 U.S. 780 (1983); and *Burdick v. Takushi*, 504 U.S. 428 (1992)). But we have previously recognized that *Crawford* "only considered a First and Fourteenth Amendment challenge, which involves a different analytical framework than what we use for [statutory] claims." *Veasey v. Abbott*, 830 F.3d 216, 249 (5th Cir. 2016) (en banc). And the Materiality Provision expressly limits states' purported "considerable discretion": States cannot "deny the right of any individual to vote in any election because of an [immaterial] error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The "considerable deference to be given to [state] election procedures" thus has no place in a materiality analysis. Op. 26.

The majority likewise borrows the "tenuousness" factor from the multifactorial test in *Thornburg v. Gingles*, 478 U.S. 30 (1986)—which applies to section 2 claims under the Voting Rights Act—in its materiality analysis. The *Gingles* factors are "used to help determine whether there is a sufficient

causal link between the disparate burden imposed and social and historical conditions produced by discrimination." *Veasey*, 830 F.3d at 245. Unlike a section 2 claim, though—as the majority recognizes—a Materiality Provision claim need not allege any evidence of discrimination. Op. 35-37. More importantly, nothing in the Materiality Provision's text or existing case law requires plaintiffs to show a "disparate burden" on the right to vote; instead, plaintiffs need only demonstrate that the state's procedural requirement "is not material in determining whether" they are "qualified" to vote. 52 U.S.C. § 10101(a)(2)(B). Accordingly, reliance on the *Gingles* factors is inapposite in the materiality context. *Cf. Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003) (explaining that the Materiality Provision "was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters"); *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir.) ("Fraud deterrence and prevention are at best tangentially related to determining whether someone is qualified to vote. But whatever sort of fraud deterrence or prevention this requirement may serve, it in no way helps the [state] determine whether a voter's age, residence, citizenship, or felony status qualifies them to vote."), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022).

## II.

The crux of the majority's materiality analysis reduces to one sentence: "Texas says it is." Op. 39. But even if we accept the majority's importation of *Crawford* and *Gingles* into the materiality context, deference to Texas's election procedures cannot save the wet-signature requirement. The majority characterizes the second step of the tenuousness analysis as requiring "that the measure advances [the state's] interest without imposing

pointless burdens." Op. 34. But as the district court carefully found, factually, the wet-signature requirement is *undisputedly* pointless.

The district court found the following undisputed facts: County registrars admitted that "they do not use a wet signature at any time or with any form of voter registration submission to determine a voter's qualification to vote." They "do not compare the telephonic-facsimile submitted signature against the wet signature, nor do they use either signature for identity verification purposes." In fact, they typically destroy the original application once they have entered the applicant's information into their computer system and saved an image of the signature.

The district court found that when county officials "investigate reported or suspected voter fraud," they use only "a scanned image of the registration signature[], not the original, wet signature." Indeed, "[a]ny fraud investigation is conducted completely electronically" and "[a]t no time is an original, wet signature used."

Tellingly, officials conceded that there is no "difference in purpose or function between a 'wet ink' signature and an electronic or imaged signature." Texas has no problem accepting registration applicants' signatures in electronic form when completed at Texas Department of Public Safety offices. Nor does Texas object to the use of electronic signatures in contracts, advance health directives, divorce decrees, and real-property closings. *See* Tex. Bus. & Com. Code Ann. § 322.007(d) (West 2023); Tex. Health & Safety Code Ann. § 166.011 (West 2023); *Bartee v. Bartee*, No. 11-18-0017-CV, 2020 WL 524909, at *3 (Tex. Ct. App. Jan. 31, 2020); Tex. Prop. Code Ann. § 12.0013 (West 2023). The record contains a simple explanation for Texas's singular interest in a wet signature in the context of registration applications submitted by fax machine: Texas officials explicitly drafted § 13.143(d-2) to prevent the use of Vote.org's e-

sign tool. Just like the states' procedural requirements in *Schwier* and *Migliori*, the immateriality of Texas's wet-signature requirement is "fairly obvious." Op. 25.

And there's the rub: Although I suppose it might hypothetically be possible that a wet-signature requirement *could* materially determine whether a voter is qualified under Texas law, Texas—and the majority—cannot point to *any* evidence of the requirement's materiality in the substantial record before us, on which we must decide this case. Instead, Texas officials' admissions that they do not use the wet signature in any capacity to determine a voter's qualifications "slams the door shut on any argument that [a wet signature] is material." *Migliori*, 36 F.4th at 164.

## III.

Even if we accept the majority's application of *Crawford* and *Gingles* to Materiality Provision claims, and even if we put to one side the factual immateriality of the wet-signature requirement, the majority's analysis *still* fails on its own terms. Texas might have had an argument that Vote.org's app implicates § 13.122(a) of the Texas Election Code if the app's electronic registration application form omits the prescribed warning statements, but Texas did not make that argument and, regardless, that has *nothing to do with* the wet-signature requirement. *See* TEX. ELEC. CODE ANN. § 13.122(a)(1), (13) (West 2023) (requiring, among other statements "on an officially prescribed registration application form," the following two statements: (1) "I understand that giving false information to procure a voter registration is perjury and a crime under state and federal law" and (2) "a statement warning that a conviction for making a false statement may result in imprisonment for up to the maximum amount of time provided by law, a fine of up to the maximum amount provided by law, or both the imprisonment and the fine"). By placing the weight of its materiality analysis

on § 13.122(a)'s required statements, the majority effectively acknowledges that the wet-signature requirement is *itself* immaterial.  *See* Op. 39-41.

That is because the "solemnity" argument put forth by Texas (and accepted by the majority) is distinct from the wet-signature requirement. Nothing ties the wet signature itself to the statements above the signature block.  In fact, Texas law does not even dictate where the prescribed statements are to be included in the registration application form.  *See* Tex. Elec. Code Ann. § 13.122(a) (West 2023).  That does not change based on whether a person signs with a pen or an electronic signature.  And there is no evidence in the record that the wet signature *itself*—as opposed to a digitally imaged signature—adds any sort of "solemnity."  Indeed, the majority's assertion that the wet-signature requirement is material hinges on "the effect on an applicant of seeing these explanations and warnings above the signature block."  Op. 42; *see also* Op. 40 (describing Texas's "solemnity" argument as "signing the form with the warnings in front of the applicant, threatening penalties for perjury and stating the needed qualifications, has some prospect of getting the attention of many applicants and dissuading false statements that an electronic signature, *without these warnings*, does not" (emphasis added)).

The majority thus loses sight of the Texas law at issue in this case: Vote.org did not challenge the materiality of § 13.122(a); it challenged the materiality of § 13.143(d-2).  Even if Vote.org's app might have implicated § 13.122(a), the wet-signature requirement—codified in a separate provision of the Texas Election Code—has nothing to do with those warnings.  Again, it requires only that "a copy of the original registration application containing the voter's original signature" be submitted to the registrar within four business days of "the transmission by telephonic facsimile machine."  Tex. Elec. Code Ann. § 13.143(d-2) (West 2023).

Because the wet-signature requirement is unrelated to the warning statements in § 13.122(a) on which the majority rests its materiality holding, I agree with the district court and see nothing to sustain the wet-signature requirement: No evidence in the record supports—or even peripherally suggests—that the wet signature *itself* is material in determining whether a Texan is qualified to vote. Quite the contrary. Texas officials explicitly drafted § 13.143(d-2) to prevent the use of Vote.org's e-sign tool. Consequently, the wet-signature requirement violates the Materiality Provision and the district court correctly enjoined its enforcement.

## IV.

I would AFFIRM the district court's grant of summary judgment for Vote.org on its statutory claim, and, therefore, I would not reach the constitutional claims.